NATURAL RESOURCES DEFENSE
COUNCIL, INC., et al.,
Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,
Defendants.

Civ. A. Nos. 3:91CV00058, 3:91CV00165.

United States District Court,
E.D. Virginia,
Richmond Division.

July 17, 1991.

David Sanburg Bailey, Richmond, Va., for Natural Resources Defense Council, Inc., et al.

Robert William Jaspen, U.S. Attorney's Office, Richmond, Va., for U.S.E.P.A., Edwin B. Erickson and William Reilly.

Manning Gasch, Jr., Joseph Marvin Spivey, III, Hunton & Williams, Richmond, Va., for Westvaco Corp., Chesapeake Corp. and Union Camp Corp.

David Ellis Evans, McGuire, Woods, Battle & Boothe, Richmond, Va., for American Paper Institute, Inc.

J. Joseph Curran, Jr., Denise Ferguson–Southard, Neile Sue Friedman, Baltimore, Md., for State of Md., Dept. of Environment.

Thomas R. Long, Richard L. Schmalz, New York City, for Westvaco Corp.

Russell S. Frye, Chadbourne & Parke, Matthew Van Hook, Washington, D.C., for American Paper Institute, Inc.

J.P. Causey, Jr., Richmond, Va., for Chesapeake Corp.

Edward C. Minor, Franklin, Va., for Union Camp Corp.

Jon M. Lipshultz, Greer S. Goldman, U.S. Dept. of Justice, Environment and Natural Resources Div., Environmental Defense Section, Roland Dubois, Office of Gen. Counsel, U.S.E.P.A., Washington, D.C., Elizabeth Lukens, Office of Regional Counsel, U.S.E.P.A., Philadelphia, Pa., for defendants.

Robert W. Adler, Jessica C. Landman, Natural Resources Defense Council, Washington, D.C., for plaintiffs.

## MEMORANDUM AND ORDER

SPENCER, District Judge.

Defendants seek partial dismissal of this suit under the Clean Water Act ("CWA"). Plaintiffs oppose this, and also seek to amend three paragraphs of their complaint, which defendants oppose in part. For the reasons that follow, the defendants' motion is GRANTED, and the plaintiffs' motion is GRANTED in part; the parties shall have an additional opportunity to further brief the propriety of part of the amended complaint.

I

Plaintiffs in this case [1] are the Natural Resources Defense Council, Inc. (NRDC), other environmental advocacy groups and individuals who claim standing based on their use of the Potomac River and adjacent waters. Defendants include the Environmental Protection Agency (EPA), its administrator William Reilly ("the Administrator"), and Edwin Erickson, the EPA administrator for Region III, which includes Maryland and Virginia.

Plaintiffs claim defendants have violated their duties under the Clean Water Act, 33 U.S.C. §§ 1251 et seq., in two ways. First, they capriciously approved Maryland's ambient water quality standard for 2,3,7,8–Tetrachlorodibezo-p-dioxin ("dioxin"), a standard which "fails to protect human health and environmental quality and otherwise to meet the goals and purposes of the CWA. Second, plaintiffs claim the EPA administrator has violated his allegedly nondiscretionary duty under the CWA to fully develop and revise EPA's water quality criteria for dioxin to "reflect the latest scientific knowledge" about dioxin. This allegedly "affected" Maryland's illegal promulgation of a dioxin water quality standard, and EPA's approval of it.

The allegations may be broken down more specifically as follows.

*EPA Dioxin Criteria*

Pursuant to the CWA and a consent decree entered in prior litigation involving the NRDC, the EPA promulgated water quality criteria for dioxin on February 15, 1984. *See* 49 Fed.Reg. 5831 (1984). The criteria are summarized in an EPA looseleaf publication commonly known as the "Gold Book."

The Gold Book states that EPA belives *any* dioxin contamination of water or aquatic organisms ingested by humans would produce some cancer-causing or other toxic effects. It also states that a zero contamination level "may not be an attainable level," and estimates the increased cancer risks at specified water contamination levels as follows: 0.0013 ppq (parts per quadrillion) for risk of one additional cancer over the lifetime of 10 million exposed persons; 0.013 ppq for one in a million cancer risk level; and 0.13 ppq for 1 in 100,000 cancer risk level.

The dioxin water quality criteria document and other EPA publications also describe identifiable non-cancer human risks of dioxin exposure, such as reproductive and developmental toxicity and liver damage. The EPA found insufficient data to develop national criteria for the effects of dioxin on aquatic toxicity.

The EPA has not proposed or published revisions to these criteria documents, despite the development of "significant new information ... calling into question the

---

1. NRDC et al. sued in 3:91CV00058 over EPA actions regarding the Maryland standard for dioxin contamination of waters, and the Environmental Defense Fund (EDF), et al., sued in 3:91CV00165 over the Virginia dioxin standards.

The suits were consolidated, and several motions to intervene granted. Although the complaints are in most respects extremely similar, the motion to dismiss implicates only Count 1 of the NRDC complaint.

validity of EPA's criteria." The information includes data demonstrating that: 1) EPA's assumptions regarding human consumption of fish and shellfish were far too low; 2) the rate of dioxin accumulation in aquatic life is much higher than EPA had assumed; 3) non-cancer health risks of dioxin "may be higher" than EPA assumed for purposes of its 1984 document; and 4) the toxicity of dioxin to fish and aquatic life, and animals higher in the same food chain, is higher than reported in the 1984 document.

EPA nevertheless published regulations as recently as April 1990 indicating that it will continue to adopt a 0.013 ppq dioxin water quality standard when it is responsible for adopting state water quality criteria. *See* 55 Fed.Reg. 14351 (1990).

### Maryland's Dioxin Standards

On November 3, 1989, Maryland proposed revisions to the water quality criteria for dioxin and other pollutants. Maryland adopted a 1.2 ppq standard for dioxin. NRDC objected to such a high standard, but Maryland adopted the standard anyway on April 6, 1990.

The state submitted its water quality standards to EPA Region III for review. It did not argue for its 1.2 ppq dioxin standard with any data or information regarding noncancer human health effects or toxic effects on fish and aquatic life or animals that consume such contaminated fish and aquatic life. Maryland ignored the same new data EPA has ignored, as described above:

> By using assumptions that err on the side of a weaker criterion in virtually every aspect of its cancer risk analysis, and by failing to consider significant new information that disputes these assumptions, Maryland's dioxin criterion fails to protect human health adequately against the cancer risk posed by dioxin.

NRDC opposed the Maryland actions with numerous comments to the EPA, but Region III nevertheless approved Maryland's dioxin standard. At least one bleach craft pulp and paper mill, operated by intervenor Westvaco Corporation, has obtained a discharge permit based on the 1.2 ppq dioxin criterion.

### Substantive Counts

Count 1 alleges the EPA administrator has failed to fulfill his nondiscretionary duties under 33 U.S.C. § 1314(a)(1) to promulgate water quality criteria accurately reflecting all identifiable effects on human health, including noncancer human health effects and toxic effects on fish and aquatic life and animals that consume such life, because the 1984 standards were based only on human health effects related to cancer. He further failed to revise the criteria as required "from time to time" to reflect "the latest scientific knowledge," as also required by the CWA.

Count 2 alleges that Maryland's dioxin standard fails generally to meet the goals and requirements of the CWA, 33 U.S.C. §§ 1311(a), 1313(c) and 1314(a). Specifically, it alleges that Maryland's failure to adopt numerical criteria to protect against *non*-cancer human health effects and adverse effects to fish, etc., is in violation of the CWA. Even if numerical criteria on such matters were impossible to create from available data, Maryland also failed to properly adopt alternatives under "criteria based on biological monitoring, or assessment methods consistent with information" published by the EPA.

The defendants thus failed to meet their CWA duties when they approved Maryland's dioxin standards:

> EPA's standard of review is, as a matter of law, contrary to CWA sections 101(a) and 303(c), including 303(C)(2)(B), which mandates state criteria adoption using "biological monitoring or assessment methods." EPA's refusal to [properly] review the Maryland standard for criteria to protect against fish and wildlife and noncancer human health effects is in error.

Therefore, defendants' approval of Maryland's dioxin standard "violated the Clean Water Act, and was arbitrary, capricious, an abuse of discretion and not in accordance with law, in violation of section 7 of the Administrative Procedure Act (APA)."

Finally, Count 3 charges that defendants' approval of the Maryland dioxin standard violated 40 C.F.R. part 131, in that the Maryland standards were not based on any scientifically defensible methods and otherwise failed to meet CWA goals and requirements.

Plaintiffs thus seek the following relief: 1) a declaration that defendants approval of Maryland's dioxin standard was unlawful under the CWA, the APA, and EPA regulations; 2) a declaration that the EPA administrator has failed to perform his nondiscretionary duty of promulgating and revising complete water quality criteria for dioxin; 3) an order requiring defendants to disapprove Maryland's dioxin standards and to promulgate a federal standard for dioxin there if Maryland fails to take such steps; 4) an order requiring the EPA administrator to perform the duties specified above (and retained jurisdiction by the Court to ensure compliance); and 5) an award of costs and fees.

## II

Consideration of the arguments requires an overview of the CWA generally.

The CWA's overall objective is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The act acknowledges that states have the "primary responsibilities ... to prevent, reduce, and eliminate pollution, to plan the development and use ... of land and water resources, and to consult with the Administrator in the exercise of his authority" under the act. *Id.* § 1251(b); *see also id.* § 1251(g) (federal agencies "shall cooperate with State and local agencies to develop comprehensive solutions" to water pollution).

Courts have acknowledged the states' primacy in controlling water pollution. *See, e.g., Chevron, U.S.A. Inc. v. Hammond,* 726 F.2d 483, 489 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985); *Committee for Consideration of Jones Falls Sewage Syst. v. Train,* 539 F.2d 1006, 1009 (4th Cir.1976).

The interplay between state and federal roles in the process of adopting water quality standards is illustrated mainly by 33 U.S.C. §§ 1313–1314.

Section 1313 generally requires states to adopt water quality standards, and submit them to the EPA, which reviews them for compliance with the CWA. The EPA may approve the standards, or notify the state of specific changes required to meet CWA requirements; if the state does not adopt such changes, or fails to submit any standards, the EPA must promulgate such standards as are necessary. *See* 33 U.S.C. §§ 1313(a), (b).

Each state "shall from time to time (but at least once each three-year period beginning with October 18, 1972)," hold hearings for the purpose of reviewing applicable water quality standards and "as appropriate, modifying and adopting standards." *Id.* § 1313(c)(1). When a state revises or adopts a new standard, that standard:

shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.

*Id.* § 1313(c)(2)(A).

In reviewing or revising standards, § 1313(c)(2)(B) directs that states:

shall adopt criteria for all toxic pollutants listed pursuant to section 1317(a)(1) of this title for which criteria have been published under section 1314(a) of this title, the discharge or presence of which in the affected waters could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses. *Such criteria shall be specific numerical criteria for such toxic pollutants. Where such numerical criteria are not available ... such State shall adopt*

*criteria based on biological monitoring or assessment methods consistent with information published pursuant to section 1314(a)(8) of this title.* Nothing in this section shall be construed to limit or delay the use of effluent limitations or other permit conditions based on or involving monitoring or assessment methods or previously adopted numerical criteria. [Emphasis added.]

The gravamen of Count 1 involves the EPA's duties under the emphasized portion of § 1314(a)(1), which states that the EPA administrator:

*shall develop and publish,* within one year after October 18, 1972 *(and from time to time thereafter revise) criteria for water quality accurately reflecting the latest scientific knowledge* (A) on the kind and extent of all identifiable effects on health and welfare including, but not limited to, plankton, fish, shellfish, wildlife, plant life, shorelines, beaches, esthetics, and recreation which may be expected from the presence of pollutants in any body of water, including ground water; (B) on the concentration and dispersal of pollutants, or their by-products, through biological, physical, and chemical processes; and (C) on the effects of pollutants on biological community diversity, productivity, and stability, including information on the factors affecting rates of eutrophication and rates of organic and inorganic sedimentation for varying types of receiving waters.

The CWA also directs the EPA to, *inter alia:* (1) develop and "from time to time" revise information on the factors necessary to restore and protect water quality and aquatic life and measure and classify water quality, *id.* § 1314(a)(2); "from time to time ... publish and revise as appropriate" information identifying conventional pollutants, *id.* § 1314(a)(4); "annually ... publish and revise as appropriate" information

identifying each water quality standard in effect under the act or state law, the specific pollutants associated with the standard, and the particular waters to which the standard applies, *id.* § 1314(a)(6); and, within 2 years after February 4, 1987, develop and publish information "on methods for establishing and measuring water quality criteria for toxic pollutants on other bases than pollutant-by-pollutant criteria, including biological monitoring and assessment methods," *id.* § 1314(a)(8).

There is no dispute that the EPA has placed dioxin on the list of "toxic pollutants" it has published and is authorized to revise "from time to time." *See id.* § 1317(a)(1).[2]

### III

Plaintiffs' original complaint invokes the jurisdiction of this Court through the citizens suit provision of the CWA, 33 U.S.C. § 1365(a)(2), which reads:

Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

. . . .

(2) against the Administrator *where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.*
The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such effluent standard of limitation, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title. [Emphasis added.]

Defendants argue that this provision does not permit jurisdiction over Count 1 of the NRDC complaint, because that count seeks to require the EPA to carry out a *discretionary* duty.

**2.** EPA claims that the statute gives it *no* duty to publish *any* criteria for dioxin. But the list of toxic pollutants referred to in 33 U.S.C. § 1317(a)(1) includes dioxin. *See* Staff of House Comm. on Public Works & Transportation, 95th Cong., 1st Sess., Data Relating to H.R.

3199 (Clean Water Act of 1977) 4 (Comm.Print No. 30). Section 1317(a)(1) requires that the pollutants on that list be "subject to this chapter." The EPA's forward to the dioxin criteria document in turn cites § 1314(a)(1) as the authority for the document.

The plain language of § 1365(a)(2) permits jurisdiction only over claimed failure to perform nondiscretionary duties. And the plain language of § 1314(a) creates only a discretionary duty in the EPA administrator to update water quality criteria generally "from time to time," to reflect the latest scientific data. Thus, whatever duty there is to update criteria falls within the administrator's discretion, defendants argue.

Defendants also claim that to the extent Count 1 challenges the *substance* of the EPA's 1984 criteria for dioxin, that is also no basis for a citizen suit. That is logical, given the highly technical and "inherently discretionary" nature of the § 1314(a) task, they add.

Defendants also emphasize that conclusory allegations of subject matter jurisdiction are insufficient to establish subject matter jurisdiction. *Burgess v. Charlottesville S & L Ass'n*, 477 F.2d 40, 43 (4th Cir.1973). Plaintiffs have the burden of proof on the motion to dismiss, and must show that they allege a claim covered under § 1365(a)(2), which is not frivolous. *See* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1350 at pp. 226–29 & accompanying notes (1990).

The critical paragraphs of plaintiffs' complaint are 44–46, which state in pertinent part, with emphasis added:

44. [33 U.S.C. § 1314(a)(1)] required the Administrator, *inter alia,* to promulgate and periodically revise, based on the latest scientific information, water quality criteria adequate to address "all identifiable effects on health and welfare...." 33 U.S.C. § 1314(a).

45. *EPA's water quality criterion for [dioxin],* despite recognizing the availability of evidence indicating a wide range of identifiable effects on health and welfare, *recommended numeric criteria based solely on human health effects due to cancer.* Therefore, the Ad-

ministrator failed to fulfill his nondiscretionary duty under [33 U.S.C. § 1314(a)(1)].

46. *Since the promulgation of EPA's water quality criterion for [dioxin] in 1984, significant new information has become available indicating that EPA's estimates of ambient water levels of [dioxin] responsible for specified cancer risks are far too low,* resulting in inadequate protection of human health. EPA is aware of and is in possession of this information, some of which has been developed by EPA scientists and published in EPA documents. *Therefore, the Administrator has violated his mandatory duty to revise EPA's water quality criteria for [dioxin] "from time to time" to reflect "the latest scientific knowledge."*

Plaintiffs note that states enforce water quality generally under the CWA through imposition of numeric dumping limits on permits. *See EPA v. California,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976); *cf.* 33 U.S.C. § 1313(c)(2)(B) (directing state water standards be based on "numerical criteria" for toxic pollutants unless "not available"). The EPA's failure to develop and publish *numerical* criteria for the effects of dioxin other than for human cancer health effects thus falls short of the § 1314(a) command, they conclude.[3] They contend that the case law indicates this is a failure to complete the mandatory duty to develop and publish the initial criteria reflecting the latest scientific knowledge.

Plaintiffs also claim that paragraph 46 of their complaint makes Count 1 survive, because the EPA has a nondiscretionary duty to revise numeric water quality criteria for dioxin to reflect the "latest scientific information," as required by 33 U.S.C. § 1314(a)(1):

In particular, while EPA initially promulgated a numeric criterion to address

---

**3.** Plaintiffs argue in passing that they allege a complete absence of criteria for effects other than human cancer. The complaint itself, and most of the plaintiffs' argument, clearly faults only the EPA's failure to produce *numeric* criteria. In addition, the criteria document (part B

of the Appendix to defendants' memorandum in support of motion to dismiss) clearly addresses a broad range of dioxin effects, and merely concludes that national *numerical* criteria for effects other than human cancer cannot be derived.

human cancer effects, recent evidence known to EPA demonstrates that (1) EPA's assumptions regarding the level of human consumption of fish and shellfish were far too low, particularly for certain subpopulations; (2) the rate at which dioxin bioconcentrates or bioaccumulates in aquatic life is much higher than assumed by EPA; (3) noncancer health risks posed by dioxin may be higher than reflected in EPA's 1984 Criteria Document; and (4) the toxicity of dioxin to fish and aquatic life, and to animals that eat contaminated fish and aquatic life, is higher than reflected in EPA's 1984 Criteria Document.

Plaintiffs' Mem. at 23–24 (citing complaint para. 27). Plaintiffs posit that "the language 'latest scientific knowledge' strongly implies that EPA must revise criteria when new science so demands," and that EPA has violated its nondiscretionary duty to do so. *Id.* at 24.

Plaintiffs also contend that even if there is no nondiscretionary duty to actually revise dioxin criteria, the statute creates a nondiscretionary duty "to decide whether to revise such criteria," particularly in light of NRDC's "detailed letter" to the Administrator presenting "compelling information" on the need for such revisions. *Id.* at 27. "At worst, the issue of whether this new [scientific data since 1984] is sufficient to have triggered such a [nondiscretionary] duty is a question of fact that cannot be resolved in the context of a motion to dismiss," plaintiffs conclude.

Throughout its argument, plaintiffs also contend that the overall structure of the CWA makes it clear that EPA's § 1314(a)(1) duties are nondiscretionary. They also note that several other portions of § 1314 include more clearly discretionary language. *See* 33 U.S.C. §§ 1314(a)(4) (Administrator to "publish and revise as appropriate information identifying conventional pollutants"), 1314(a)(6) (Administrator to annually publish and revise "as appropriate" information identifying water quality standards).

They also rely heavily on legislative history, and inferences from that history.

They contend, for example, that the 1987 amendments which added 33 U.S.C. §§ 1313(c)(2)(A) and (B) reflect the following relevant congressional concerns: 1) that EPA numeric water quality criteria were essential to adoption of proper state standards; 2) that EPA should revise its criteria at least every three years, because the states have to review their standards triennially; and 3) that states were dragging their feet in reviewing and revising their water quality standards, in part because EPA was slow in revising its water quality criteria.

Finally, plaintiffs contend that their proposed amended complaint would give the Court general federal question jurisdiction under 28 U.S.C. § 1331 over Count 1. The proposed amendments would make the following *additions* to the specified paragraphs of the original complaint:

27. [O]n April 8, 1991, Defendant EPA Administrator Reilly signed a memorandum to Erich W. Bretthauer, Assistant Administrator for Research and Development (ORD), and to E. Donald Elliott, General Counsel, requesting that ORD conduct a comprehensive review of EPA's dioxin risk assessment, based on significant new scientific information.

45. [M]oreover, this failure was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and constituted agency action unlawfully withheld or unreasonably delayed; in violation of 5 U.S.C. § 706.

Paragraph 46 contains the same addition as paragraph 45.

Defendants apparently concede that the amendments would permit general federal question jurisdiction. They note, however, that the amendment to paragraph 45 would be ineffective, because of the 6 year statute of limitations of 28 U.S.C. § 2401(a). Since the proposed amendment would be futile, it should be denied as far as it relates to paragraph 45. *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980), *cert. dismissed*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980).

## IV

■ Plaintiffs' arguments rest on three propositions: 1) the initial criteria were incomplete because they should have included numerical criteria for all identifiable effects, not just human cancer effects; 2) the plain language of § 1314(a)(1) imposes a nondiscretionary duty on the Administrator to do both that and revise whenever science demands it; and 3) even if the plain language does not demonstrate this alone, it does when read in conjunction with the rest of the CWA and the legislative history of the act and its amendments.

### Lack of numerical criteria

*Nowhere* does § 1314(a)(1) say EPA must develop numerical criteria for toxic pollutants. The accepted definition of water quality criteria does not compel numerical standards:

The word "criterion" should not be used interchangeably with, or as a synonym for, the word "standard." The word "criterion" represents a constituent concentration or level associated with a degree of environmental effect upon which scientific judgment may be based. As it is currently associated with the water environment it has come to mean a designated concentration of a constituent that when not exceeded, will protect an organism, an organism community, or a prescribed water use or quality with an adequate degree of safety. *A criterion, in some cases, may be a narrative statement instead of a constituent concentration.* On the other hand, a standard connotes a legal entity for a particular reach of waterway or for an effluent. A water quality standard may use a water quality criterion as a basis for regulation or enforcement, but the standard may differ from a criterion because of prevailing local natural conditions, such as natural conditions, such as naturally occurring organic acids, or because of the

importance of a particular waterway, economic considerations, or the degree of safety to a particular ecosystem that may be desired.

U.S.E.P.A., *Quality Criteria for Water* 2–3 (July 1976) (preface reproduced as Appendix A to Defendants' Mem.); *see also* 40 C.F.R. § 131.3(c) and (i) (1990) (defining criteria and standards).

Thus, there is no basis for viewing the 1984 dioxin criteria document as being "incomplete," for failure to contain more numerical concentration limits.

Plaintiffs argue at length, however, about how 33 U.S.C. § 1313(c)(2)(B) tells states reviewing their water quality standards that they *shall* adopt the EPA criteria for toxic pollutants, including dioxin, and then directs that such criteria "shall be specific numerical criteria for such toxic pollutants." But immediately after the language plaintiffs emphasize, it states:

*Where such numerical criteria are not available,* ... such State shall adopt criteria based on biological monitoring or assessment methods consistent with information published pursuant to section 1314(a)(8) of this title.

The section therefore explicitly contemplates that the EPA may have adopted nonnumerical criteria for toxic pollutants, and tells states they may adopt criteria based on other methods consistent with guidelines published by the EPA pursuant to § 1314(a)(6).[4] That is certainly the interpretation which the EPA has given to the statute. *See* 55 Fed.Reg. 14350 (1990).

Plaintiffs also argue that paragraph 11 of a consent decree entered years ago mandates fixed numerical criteria for dioxin.

The Administrator shall publish, under Section 304(a) of the Act, water quality criteria accurately reflecting the latest scientific knowledge on the kind and extent of all identifiable effects on aquatic organisms and human health of each of

---

**4.** This requires the administrator to publish information on methods for establishing and measuring criteria for toxic pollutants on bases "including biological monitoring and assessment methods." 33 U.S.C. § 1314(a)(8); *cf.* 40 C.F.R. § 131.11(b) (1990) (describing form of criteria

states should adopt). The EPA has apparently issued at least two documents pursuant to this mandate. *See* 55 Fed.Reg. 52097 (Dec. 19, 1990) (announcing availability of national guidance documents on biological criteria for surface waters and wetlands).

the pollutants listed in Appendix A [which includes dioxin]. Such water quality criteria shall state, *inter alia,* for each of the pollutants listed in Appendix A, *the recommended maximum permissible concentrations* (including where appropriate zero) consistent with the protection of aquatic organisms, human health and recreational activities.

*NRDC, Inc. v. Costle,* 12 Env't Rep.Cas. (BNA) 1833, 1843 (D.D.C.1979) (emphasis added), *modifying* 8 Env't Rep.Cas. (BNA) 2120 (D.D.C.1976). There are several reasons why this does not matter.

First, § 1365(a)(2) only permits citizen suits for failure to meet nondiscretionary duties "under this chapter." Whatever duty imposed in the consent decree is a judicially imposed one based on an agreement among the parties, not one explicitly stated in the statute.

Second, plaintiffs are simply wrong when they suggest that the consent decree represents EPA's admission that numeric criteria are required. This invokes the general rule of issue preclusion:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

Restatement (Second) Judgments § 27 (1982). But the "actually litigated and determined" requirement obviously renders the general rule inapplicable to consent decrees:

> In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action.

*Id.* § 27 comment e. Thus, the consent decree does not establish that the CWA mandates numerical criteria.

Third, to the extent plaintiffs seek merely to enforce what they contend is a violation of the above decree in this court, they are in the wrong forum. This flows logically from the settled proposition that the power to punish a violation of an injunction "rests in the court which granted the injunction and, in the absence of statute, in that court alone." 43A C.J.S. *Injunctions* § 301 at p. 658 (1978) (footnote omitted); *see Stiller v. Hardman,* 324 F.2d 626, 627–28 (2d Cir.1963) (affirming New York federal court's refusal to enforce injunctive portion of Ohio federal court judgment); *Suburban O'Hare Comm'n v. Dole,* 603 F.Supp. 1013, 1025–26 (N.D.Ill.1985) (dictum that enforcement of consent decree should be done by way of motion before court which issued decree).

Plaintiffs' reliance on *EPA v. California, supra,* is also somewhat misplaced. There, the Supreme Court recognized that the 1972 CWA amendments do prescribe a national permit system as the primary means for enforcing numerical effluent limitations on discrete point sources of pollution. *See EPA v. California,* 426 U.S. at 204–07, 96 S.Ct. at 2024–25. But the Court also recognized that:

> [w]ater quality standards are retained as a supplementary basis for effluent limitations, however, so that numerous point sources, despite individual compliance with effluent limitations, may be further required to prevent water quality from falling below acceptable levels.

*Id.* at 205 n. 12, 96 S.Ct. at 2025 n. 12.

In short, the permit system limits numerical rates or quantities of dumping from discrete points; the general "water quality standards" system offers supplementary *general* guidelines for determining whether a whole body of water is unacceptably polluted.[5]

If § 1314(a)(1) does not mandate *numerical* criteria for all identifiable dioxin effects, much of the remainder of plaintiffs' argument collapses.

---

**5.** Plaintiffs do not challenge any absolute effluent limitations, or the review of any such limitations, which is required every five years and, "if appropriate," must be revised to comply with current technical feasibility. *See* 33 U.S.C. § 1311(d). Such a challenge would properly lie in the court of appeals. *See id.* § 1369(b)(1)(E).

For example, plaintiffs cite several cases for the proposition that agencies do have nondiscretionary duties to issue *complete* rulemaking; i.e., the Administrator's failure to issue numerical criteria for all dioxin effects is a complete failure to comply with the duty to promulgate criteria, and thus actionable under § 1365(a)(2). But if § 1314(a)(1) does not require numbers, then the argument fails.

For that matter, the cases plaintiffs offer for this proposition seem distinguishable. Two of the cases are *Chemical Mfrs. Ass'n v. USEPA,* 870 F.2d 177 (5th Cir.1989), *clarified,* 885 F.2d 253 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990), and *United Techs. Corp. v. USEPA,* 821 F.2d 714 (D.C.Cir. 1987). In the former case, the court found citizens suit jurisdiction over a portion of the complaint seeking "to compel the Administrator to promulgate [pollution] regulations in the first instance," and noted that such jurisdiction was proper where the complaint alleged EPA had exceeded a statutory and specific (180-day) deadline. *Chemical Mfrs.,* 870 F.2d at 225–26, 266. In the latter, the court did not even appear to address the jurisdictional question.

*The Plain Language*

Plaintiffs emphasize that § 1314(a)(1) contains the phrase "shall develop and publish." They rely on *NRDC, Inc. v. Train,* 545 F.2d 320 (2d Cir.1976) [hereinafter "*NRDC (1976)*"] and *EDF v. Thomas,* 870 F.2d 892 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 537, 107 L.Ed.2d 535 (1989), for the proposition that the presence of "mandatory statutory language is [a] compelling indication of mandatory intent." The argument generally is too broad, and the cases distinguishable.

In *NRDC (1976),* the district court required the Administrator under the citizens suit provision of the Clean Air Act (CAA)[6] to place lead on a list of air pollutants under § 108(a)(1) of the CAA. *NRDC (1976),* 545 F.2d at 322. That provided that the Administrator:

For the purpose of establishing national primary and secondary ambient air quality standards ... shall ... publish, and shall from time to time thereafter revise, a list which includes each air pollutant (A) which in his judgment has an adverse effect on public health or welfare; (B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and (C) for which air quality criteria had not been issued before December 31, 1970, *but for which he plans to issue air quality criteria under this section.*

*Id.* (emphasis added).

The EPA conceded that lead met the conditions of subsections (A) and (B) of the statute, but argued that the emphasized part of subsection (C) left the Administrator with the discretion whether to list a pollutant. It argued that he could choose to control lead either by way of §§ 108–110 of the statute, or only through § 211 of the CAA, which permitted the Administrator to regulate fuels and fuel additives by a registration procedure. *See id.* at 324 & 325 n. 7.

The appeals court rejected that argument and affirmed the district court, for several reasons. First, it would have rendered the flush mandatory language of § 108(a)(1) "mere surplusage," permitting the Administrator to bypass otherwise rigid statutory deadlines of related provisions. *Id.* at 325. Second, the Administrator had initially taken a contrary position in published notices. *Id.* Third, the CAA made EPA responsible for setting national ambient air *standards,* as well as criteria. *See id.* at 323 n. 4, 327. The CAA was a statutory scheme loaded with mandatory deadlines for the EPA and the states, which only submit implementation plans, the court emphasized. Most important, the legislative history indicated that the initial list had to include all pollution agents which meet the first two requisites of § 108(a)(1). *See id.* at 325–27.

*NRDC (1976),* therefore, would be most helpful to plaintiffs if EPA simply had *never* issued criteria for dioxin. Since such

---

**6.** The citizen suit provision of the CWA was explicitly modeled on this. *NRDC v. Train,* 510

F.2d 692, 699 (D.C.Cir.1975) [hereinafter "*NRDC (1975)*"].

criteria have been issued, and plaintiffs challenge only the failure to adopt *numerical* criteria for everything, *see supra* note 3, this case is of limited value here.

In any case, the Administrator here has not conceded that numerical criteria or revision are required. *Cf. NRDC, Inc. v. Thomas,* 885 F.2d 1067, 1069 (2d Cir.1989) (affirming dismissal of CAA citizens suit where district court ruled that Administrator had not yet determined that certain pollutants were hazardous air pollutants requiring listing under § 112(b)(1)(A) of CAA).

As noted *infra,* the legislative history is at best equivocal about the need for *numerical* criteria, or to revise any relevant criteria more frequently than EPA has to date. And EPA's decision not to issue numerical criteria, or to revise more often, does not allow the Administrator to effectively bypass otherwise rigid mandatory duties; the CAA provision at issue in *NRDC (1976)* involved threshold EPA action which then triggered numerous other mandatory duties and regulatory deadlines for the agency itself, which would have been rendered moot had the EPA's argument been accepted. Here, the absence of numeric criteria or more frequent revisions affects only the states' duties under § 1313(c) to create water quality standards based on numerical criteria—and even that is a duty which is not absolute.[7]

In *EDF v. Thomas,* the district court held that the Administrator's authority to revise National Ambient Air Quality Standards (NAAQS) for sulphur oxides ("SOx") was discretionary, and that it was thus without discretion to order him to make any revisions. The Second Circuit agreed the Administrator had discretion to decide "the precise form and substance" of the relevant NAAQS, but held that under the circumstances the Administrator had a non-discretionary duty "to make *some* formal decision whether to revise those NAAQS."

*EDF v. Thomas,* 870 F.2d at 894 (emphasis in original).

The statutory provision in dispute there was § 109(d) of the CAA, which required the Administrator not later than December 31, 1980, and at five year intervals thereafter to "complete a thorough review of the criteria published under Section 108 ... and promulgate such new standards as may be appropriate." *Id.* at 895.

In 1985, plaintiffs brought a citizens suit to compel the Administrator to promulgate revised NAAQS for SOx. They alleged the Administrator's revised air quality criteria of 1982 and "critical assessment" documents of 1984–85 "constituted a formal finding that SOx caused acid deposition threatening to the public health and welfare," thus creating a nondiscretionary duty on the Administrator "to revise the NAAQS for SOx, pursuant to Sections 109(b) and 109(d), in order to combat such health and welfare effects." *Id.*

Plaintiffs argued on appeal that § 109(d) had to be read in light of the mandatory language of §§ 109(a) and (b), which set certain specific deadlines for criteria publication under certain circumstances. The appeals court demurred, because § 109(d) contained no cross-reference to § 109(a), and because there was no reason why standards for promulgation of initial NAAQS should be the same as for revised standards. "Congress could have repeated the mandatory language of Section 109(a) and Section 109(d), but did not do so." *Id.* at 898.

Plaintiffs also argued that the "as may be appropriate" language was subject to § 109(d)'s own preceding language that the Administrator "shall make revisions." The court again disagreed. It noted that "as may be appropriate" is clearly language of discretion, and that the existence of "shall language" implies only that the district court has jurisdiction to order the Adminis-

---

7. CWA Section § 1313(c)(2)(B) requires states to adopt the § 1314(a) published criteria for toxic pollutants only if 1) they are available and 2) the presence of the pollutant "could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to sup-

port such designated uses." Where numerical criteria are not available, states may adopt *any* criteria (i.e., even ones different from EPA's non-numeric criteria) consistent with published biological monitoring or assessment methods.

trator to make *some* formal decision whether to revise the NAAQS, the content of that being within the Administrator's discretion and reviewable only in the District of Columbia Circuit.[8]

Finally, plaintiffs argued that *NRDC (1976), supra,* compelled finding district court jurisdiction, because other EPA actions constituted, in effect, "a formal decision that revision of the SOx NAAQS is 'appropriate' according to the terms of Section 109(d)." The court again disagreed:

> The duty at issue in *Train* was a thoroughly ministerial one. We did no more than affirm an order compelling the EPA to include "lead" on a list and to issue some NAAQS for lead. We did not, however, specify the content of those NAAQS. *Train thus stands solely for the proposition that the district court has jurisdiction, under Section 304, to compel the Administrator to perform purely ministerial acts, not order the Administrator to make particular judgmental decisions.* An order in the instant case to the Administrator to revise the NAAQS for SOx would be essentially meaningless and unenforceable unless it also directed that he revise those NAAQS in a particular manner. Formulating the details of substantive NAAQS, however, clearly requires the sort of scientific judgment that is the 'hallmark' of agency discretion....

*Id.* at 899–900 (citations omitted, emphasis added).

The court held, nonetheless, that the district court had jurisdiction "to compel the Administrator to take some formal action, employing rulemaking procedures, either revising the NAAQS or declining to revise them." *Id.* The court reasoned that "[C]ongress's intent that the Administrator make *some* decision is clear." To hold otherwise would be to leave the issue "in a bureaucratic limbo" subject neither to review in the district court or the D.C. Circuit. *Id.*

Judge Mahoney offered a terse dissent. He stated that there simply was no indication that § 109(d) imposed upon the Administrator the kind of "clear-cut nondiscretionary duty" subject to citizen suits. *Id.* at 900–01 (discussing *Sierra Club v. Thomas,* 828 F.2d 783 (D.C.Cir.1987) and *NRDC v. Train,* 510 F.2d 692 (D.C.Cir.1975)).

*EDF v. Thomas* is a peculiar case. On one hand, it rejects several analogous arguments made by plaintiffs in this case. Here, like in *EDF,* Congress could have used the same triennial review process and "numerical criteria" language in § 1314(a)(1) as it chose to put in § 1313(c), dealing with *state* responsibilities; it did not. And here, like in *EDF,* the duty involved cannot be described as "purely ministerial." Also, § 1314(a)(1) directs the Administrator to revise criteria only from "time to time," to reflect latest scientific knowledge. This is less discretionary than the "as may be appropriate" language emphasized in *EDF,* but much more discretionary than any specific time period.

On the other hand, *EDF* supports plaintiffs' argument that citizens suit jurisdiction exists to compel the Administrator to engage in some formal process of deciding if standards should be revised or not. The Court believes there are three related reasons why *EDF* should not be deemed controlling.

First, § 109(d) of the CAA explicitly required the Administrator to review certain criteria every five years, and then from this review to determine whether new standards were appropriate. Section 1314(a)(1) here has no comparable "interval" review period. *See NRDC, Inc. v. Thomas,* 885 F.2d 1067, 1075 (2d Cir.1989) (interpreting *EDF v. Thomas* as grounded on observation that § 109(d)(1) included stated deadlines); *see also Sierra Club v. Thomas,* 828 F.2d 783, 791 (D.C.Cir.1987) (times when "one can conclude that an inferable [as opposed to stated] deadline imposes a man-

---

**8.** The CAA has a bifurcated jurisdiction scheme, in which the D.C. Circuit Court has original jurisdiction over challenges to certain substantive standards. *See EDF,* 870 F.2d at 896–97.

Certain CWA actions, not at issue here, must also be brought before the circuit courts. 33 U.S.C. § 1369(b)(1).

datory duty of timeliness" will be "very rare").

Second, § 109(d) also prescribes the *process* the Administrator must take to determine the propriety of new standards—conduct a complete review of § 108 criteria, at least every five years. Section 1314(a)(1) only tells the Administrator to keep up on scientific knowledge generally. This necessarily implies that he has the discretion to determine the method and substance of his reviewing process. *Cf. EDF v. EPA*, 598 F.2d 62, 83–85 (D.C.Cir.1978) (administrative feasibility and deference to agency's scientific expertise counsel against precluding EPA's regulating PCBs based on knowledge of related substances).

Third, in *EDF v. Thomas* the EPA had published criteria and other documents which acknowledged "in some detail" the ill effects of acid disposition caused by SOx pollution. *See EDF*, 870 F.2d at 895, 899–900. The appeals court construed these explicit EPA findings as having "triggered a duty on the part of EPA to decide whether and what kind of revision is necessary" to the NAAQS. *Id.* at 900. Here, EPA has made no such foundational findings which could "trigger" any further duties.

Of course, Judge Mahoney also makes relevant points in his dissent. Courts routinely acknowledge the limited scope of citizen suits jurisdiction, especially where clear statutory deadlines for regulatory revisions are absent. *See, e.g., Sierra Club v. Thomas*, 828 F.2d at 791; *Wisconsin's Environmental Decade, Inc. v. Wisconsin Power & Light Co.*, 395 F.Supp. 313, 321 (W.D.Wis.1975).

Plaintiffs also claim that *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349 (9th Cir.1978) supports the same proposition that *EDF v. Thomas* does. In fact, the court there explicitly stated that there was *no* citizens suit jurisdiction over the plaintiffs' claims. *Kennecott*, 572 F.2d at 1353–54 & n. 2.

Returning to the statute, it says two things: 1) the Administrator must develop and publish within one year after October 18, 1972 criteria for water quality; and 2) he shall revise them "from time to time" to reflect updates in the latest scientific knowledge. The question is whether either of these two requirements raises a nondiscretionary duty, of which the plaintiffs complain.

As noted above, plaintiffs do not challenge the *timing* of the original dioxin criteria document, but state the publication is incomplete because it does not contain complete numerical criteria. That argument must fall because this Court does not find that the CWA requires the EPA to publish numerical criteria.

As for the "time to time" updates reflecting latest scientific knowledge, plaintiffs concede they have only a weak argument. They highlight their allegations that "new data [published or known by EPA] include substantial information suggesting that EPA's current water quality criteria for dioxin may be too weak." Plaintiffs' Mem. at 9 (citing complaint para. 27).

This in turn highlights two points: 1) plaintiffs' complaint is really about the current substance of the dioxin criteria; and 2) the phrase "accurately reflecting the latest scientific data" is subject to interpretation.

Neither point supports the suggestion that the Administrator's revision duty is nondiscretionary. *See Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654, 662–63 (D.C.Cir.1975) (suggesting there is no nondiscretionary duty not to greatly abuse discretion); *id.* at 656–61 (actions seeking revision of national performance standards under § 111 of CAA are challenge to standard itself, and not subject to CAA citizens suit jurisdiction).

*CWA Synergy and Legislative History*

Plaintiffs cite *NRDC, Inc. v. Train*, 510 F.2d 692 (D.C.Cir.1975) [hereinafter *"NRDC (1975)"*], for the proposition that a nondiscretionary duty can be inferred "from the language and structure of the statutory scheme as a whole, particularly (but not exclusively) where compliance with the duty is necessary to effectuate a related statutory deadline." This reliance is greatly misplaced.

The appeals court there affirmed that the Administrator had certain limited nondis-

cretionary duties to publish a limited category of effluent limitation guidelines dealing with point source categories under the CWA where there was a specified deadline to do so. 510 F.2d at 704 (construing 33 U.S.C. § 1314(b)).

But the court *vacated* the district's order imposing a publication schedule as it related to guidelines for other categories, because the Administrator apparently had "discretion over the time of listing some of the toxic pollutants to be regulated." *See id.* at 705; *see also id.* at 711–12 ("Where there has been no violation of a statutory duty ... the proper course is to confine ourselves to a declaration of the intent of Congress and to give the Administrator latitude to exercise his discretion in shaping the implementation of the Act."). The court thus vacated the district court's order in part, and remanded with directions that the district court eliminate or stay its schedule order, as appropriate in light of the Administrator's arguments for greater time to appreciate the "relative merits of available control technologies." *See id.* at 712–14.

In short, *NRDC (1975)* at best indicates that "a nondiscretionary duty of timeliness may arise even if a deadline is not explicitly set forth in the statute, if it is readily-ascertainable by reference to some other fixed date or event."[9] *Sierra Club*, 828 F.2d at 790 (construing *NRDC (1975)*).

It is also unclear how the case approached the jurisdictional question; the appeals court never actually decided that the district court had jurisdiction under the citizens suit provision. *See NRDC (1975)*, 510 F.2d at 698–99, 703, 714 & nn. 32, 57; *see also Sierra Club*, 828 F.2d at 789–90 (noting same).

Plaintiffs cite assorted portions of 1987 amendments to the CWA, for the proposition that Congress wants numerical criteria from EPA, and is frustrated by the slow

pace of development of those criteria. Again, the argument is not persuasive.

Consider the following language from a Senate report on the CWA amendments of 1985 (S 1128), one of several alternative bills which gave birth to the actual 1987 amendments:

> Although the EPA continues to move forward with developing guidelines for the installation of cleanup technology for both direct and indirect discharges, the slow pace in which these regulations are promulgated continues to be frustrating.

S.Rep.No. 50, 99th Cong., 1st Sess. 3 (1985) [hereinafter "1985 Senate Report"].

Plaintiffs insist this shows Congressional frustration with the EPA, and lawmakers' intent that EPA update water quality criteria more frequently. But that passage discusses EPA's "best available technology" requirements for effluent limitations and pre-discharge treatment, i.e., point-source pollution, rather than EPA's more general duty to provide ambient water quality criteria.

In addition, the report recognizes that "states have primary responsibility [under 33 U.S.C. §§ 1311 and 1313] to establish the designated uses of their water bodies and the duty to implement standards that protect those uses." *Id.* at 5. Furthermore, the following passage also relied on by plaintiffs[10] again refers only to the need for *states* to use numerical criteria for certain toxic pollutants, in developing their own water quality standards based on designated uses:

> While numerical criteria are immediately required for toxic pollutants which are highly persistent, bioaccumulative, or known or suspected carcinogens, mutagens, or teratogens, for other toxic pollutants biomonitoring can be used until numerical criteria can be developed.

*Id.* at 23. Furthermore, the report states that under the proposed act, "states shall

---

9. The provision in question in *NRDC (1975)* stated, "the Administrator shall ... publish within one year of October 18, 1972, regulations providing guidelines for effluent limitations." It had nothing to do with statutory provisions requiring revisions without specific deadlines.

10. Plaintiffs actually cite another report, but the language they cite is substantially similar to the language cited from the reports cited herein.

establish specific numerical criteria *based on EPA's existing national water quality criteria and other sources,*" without indicating at all that EPA was expected to create numerical criteria. *Id.*

Plaintiffs also rely on the following language from a Senate Public Works Committee report on the 1971 bill to amend the relevant law:

The development of information which describes the relationship of pollutants to water quality is essential for carrying out the objectives of the Act.... Criteria to be developed ... should draw upon the best scientific knowledge on the subject, including information, if any, from the National Academy of Sciences, the U.S. Geological Survey in the Department of Interior, scholarly literature, academic experts, and other sources.

Criteria establish the effects of pollutants on health or welfare, including the effects of pollutants on ... water ecosystems and man, and identify the natural chemical, physical and biological integrity of the Nation's waters.

S.Rep. 414, 92d Cong., 1st Sess. 49 (1971).

This shows only that Congress recognized EPA's role in information development is important. It does not state or imply that EPA must develop numerical criteria, or that it must revise criteria at any particular time interval.

It also seems significant that the Senate debates on the 1972 legislation hardly even mentioned § 304 of the act, except in general terms of the EPA's duty to publish and occasionally revise criteria and other water quality-related information. *See* 2 Environmental Policy Div'n of the Cong.Research Serv., A Legislative History of the Water Pollution Control Act Amendments of 1972 at 1253–1414.

The discretion afforded the Administrator by current § 1314(a)(1) may also be inferred from the absence in that statute of language proposed by the House in 1985, in HR 8. A House committee print indicates that bill would have required EPA to consider additional designated factors in creating or revising criteria, and to publish a description of any "well founded and significant difference of opinion" as to latest scientific and research knowledge on those factors. *See* H.R.Rep. No. 189, 99th Cong., 1st Sess. 27, 84 (1985)

Congress refused to require the Administrator to publish reports of significant differences of opinion as to scientific knowledge supporting criteria revisions. It thus implicitly recognized that *any* revision would be subject to significant differences of opinion, and that the Administrator therefore has the discretion to determine when "the latest scientific knowledge" compels a revision of criteria.

In short, EPA water quality criteria and state-created water quality standards are not as intertwined as plaintiffs contend. The same statutory provision requiring states to adopt EPA-produced numerical criteria also acknowledges that EPA may not have numerical criteria for all toxic pollutants. It also recognizes that states need only modify or adopt new standards, "as appropriate." This does not support the argument that EPA has a nondiscretionary duty to create numerical criteria for all known effects of dioxin, or that it must add numerical criteria in light of the 1987 amendments.

*Supplemental Authority*

Plaintiffs filed a notice of supplemental authority, accompanied by a slip opinion from the United States District Court for the Western District of Washington. That case is of little relevance.

There, plaintiffs noted that Alaska was over 10 years late in identifying "water quality limited" waters and submitting proposed "total maximum daily loads" (TMDLs) for certain pollutants to the EPA. Under the CWA, the EPA must review the submissions within 30 days and approve them, or take an additional 30 days after disapproval to make its own identification of limited waters and implement the applicable TMDLs.

Plaintiffs argued, and the district court accepted, that this lengthy delay amounted to a "constructive submission" of *no* TMDLs, thereby triggering EPA's mandatory duty under the law to promulgate

TMDLs for Alaska on its own. The court concluded:

> Section 303(d) expressly requires the EPA to step into the states' shoes if their TMDL submissions or lists of water quality limited segments are inadequate. It is consistent to conclude that the "inadequacy" of a submission includes deliberate, silent inaction.

*Alaska Center for the Environment v. Reilly,* 762 F.Supp. 1422, 1429 (W.D.Wash. 1991), *see also Scott v. Hammond, Ind.,* 741 F.2d 992 (7th Cir.1984) (followed by Washington court). The court thus granted plaintiffs partial summary judgment, and indicated that it would order EPA to initiate its own process of promulgating TMDLs and identifying appropriate waterbodies at issue. *Alaska Center,* at 1429.

### V

Plaintiffs seek to maintain the *substance* of Count 1 by way of an amended pleading which defendants only partially oppose.

 Generally, leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Leave should be granted absent "undue delay, bad faith or dilatory motive, ... undue prejudice to the opposing party ..., [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). "[M]ere delay absent any resulting prejudice" normally is insufficient reason to deny a pleading amendment. *Ward Elecs. Servs., Inc. v. First Commercial Bank,* 819 F.2d 496, 497 (4th Cir.1987).

Under these circumstances, the amendments to paragraph 27 and 46 should be granted. The amended paragraph 46 would thus allege that defendants' failure to revise water quality criteria for dioxin since 1984 amounts to agency action "unlawfully withheld or unreasonably delayed," or otherwise unlawful under 5 U.S.C. § 706. *See Sierra Club,* 828 F.2d at 789–90 & nn. 49–52 (under *NRDC (1975),*

unnecessary to resolve whether jurisdiction based on nondiscretionary duty or abuse of discretion and agency action unreasonably delayed); *EDF v. EPA,* 598 F.2d at 91 & n. 107.[11]

Defendants argue persuasively that amendment as to paragraph 45 should be denied, however, because the claim it describes would be time-barred.

The allegation that EPA's *initial* water quality criteria for dioxin were "unlawfully withheld or unreasonably delayed" is moot. They are out, and have been in existence since 1984. The allegation that the initial criteria were "arbitrary, capricious, [and] an abuse of discretion," regards EPA action that took place more than six years before the original complaint was filed. It thus appears barred by the 6–year statute of limitations of 28 U.S.C. § 2401(a), which states:

> Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

*See Shiny Rock Mining Corp. v. United States,* 906 F.2d 1362, 1364–65 (9th Cir. 1990). *See generally Sisseton–Wahpeton Sioux Tribe v. United States,* 895 F.2d 588 (9th Cir.) (discussing § 2401 and noting it applies to equitable and monetary damage claims), *cert. denied,* —— U.S. ——, 111 S.Ct. 75, 112 L.Ed.2d 48 (1990).

Plaintiffs at oral argument on the instant motions offered new arguments and authority against the application of the limitations bar, however. The Court will thus permit filing of the entire amended complaint, and rule on the paragraph 45 amendment after the parties have an opportunity to further brief the issue.

---

**11.** As both these cases recognize, the Supreme Court has held that the Administrative Procedure Act does not afford an independent basis for subject matter jurisdiction, but general federal question jurisdiction typically exists under 28 U.S.C. § 1331 to review agency action in violation of APA standards. *See Califano v. Sanders,* 430 U.S. 99, 105–07, 97 S.Ct. 980, 984–85, 51 L.Ed.2d 192 (1977).

## VI

The Court feels compelled to raise two other points.

First, an APA claim of unreasonable delay in revising the dioxin standards may eventually become moot. The defendants represent that EPA has "devoted a considerable amount of time since 1984 to analysis of whether the dioxin criteria should be revised." The Administrator in April 1991 requested that the EPA Office of Research and Development conduct a comprehensive review of EPA's dioxin risk assessment, based on significant new scientific information. *See* Attachments to Defendants' Reply Mem.

There appears no precedent for this Court to require EPA to make *specific* revisions to the dioxin criteria.[12] The Court could do no more than declare that the criteria are now obsolete, and/or that the revisions have been unreasonably delayed, and order that defendants' current review process culminate in timely formal rulemaking which discusses revisions (or refusals to revise) and the alleged justification for the decisions.

Second, the approach to trial on amended Count 1 is a daunting question in itself. In *Oljato*, the court held that a challenge to EPA's refusal to revise standards for coal-fired electric generating plants was a challenge to the standards themselves, properly reviewed only in the D.C. Circuit and not in the district court as a citizens suit. *See Oljato*, 515 F.2d at 656. But the court recognized that the Administrator's failure to revise left it in the "awkward position" of having no record against which to judge the merits of plaintiffs' contentions. *Id.* at 665.

The court therefore adopted the following procedure: 1) persons seeking revision must petition EPA to revise the standard in question, together with supporting materials or references to supporting materials; 2) EPA must respond to the petition and, if it denies it, set forth its reasons; and 3) if the petition is denied, petitioner may seek review.[13] *Id.; see also NRDC, Inc. v. Administrator, USEPA*, 902 F.2d 962, 988 (D.C.Cir.1990) (Wald, C.J.) (ordering EPA to provide court within 60 days with "clear and cogent reasons" why it had not acted for 10 years past statutory deadline for revising NAAQS to account for acid rain), *vacated in pertinent part on petitioners' motion for voluntary dismissal*, 921 F.2d 326 (D.C.Cir.1991), *cert. denied,* — U.S. ——, 111 S.Ct. 806, 112 L.Ed.2d 865 (1991).

An alternative would be to construe the scientific facts in question as "legislative," and have them submitted through "Brandeis briefs" without actual trial. Currie, *Judicial Review Under Federal Pollution Laws*, 62 Iowa L.Rev. 1221, 1252 (1977). Presentation of such information—which may be of tremendous scope and quantity—in a formal bench trial is the other option.

This Court is of course willing and able to consider valid disputes. But the Court must observe here that everyone may be better served if the EPA agreed to an expedited schedule for consideration of dioxin criteria revision—a process which it has apparently already initiated. This would effectively render moot any question of timeliness, and the revised criteria may substantially narrow the parties' disputes on the arbitrary and capricious claim. *Cf. Atlantic States Legal Found. v. Tyson Foods*, 682 F.Supp. 1186, 1190 (N.D.Ala. 1988) (staying suit against alleged NPDES permit violator where defendant had spent substantial sums upgrading facility, making it likely that claim would become moot when upgrading completed). It would also, of course, create an administrative record for more systematic review by this Court.

---

12. *See, e.g., EDF v. Thomas*, 870 F.2d at 894 (Administrator has discretion to decide "precise form and substance" of NAAQS revisions, but district court may order Administrator to continue rulemaking process already started); *id.* at 900 (district court has no jurisdiction to order particular revision); *NRDC (1975)*, 510 F.2d at 712 ("The courts cannot responsibly mandate flat guideline deadlines" when reasonable delay may be required "to give meaningful consideration to the technical intricacies" of issues, thereby "obviating the need for time-consuming corrective measures at a later date.").

13. This procedure was called into doubt in *EDF v. Thomas*, 870 F.2d at 897 n. 1.

The Court would appreciate the parties' suggestions about how to conduct trial on amended Count 1.

### VII

For the reasons stated above: (1) defendants' motion to dismiss Count 1 of the original complaint is GRANTED, and (2) plaintiffs' motion for leave to file an amended complaint is GRANTED, subject to further briefing on the statute of limitations issue as it affects the new claims of paragraph 45 of the amended complaint.[14] The plaintiffs are further ORDERED to file within 11 days of the date of this Order a memorandum addressing the limitations issue; defendants are ORDERED to respond to such memorandum within 10 days after its service.[15]

And it is SO ORDERED.

14. Count 1 of the amended complaint shall proceed, if at all, only on APA theories and general federal question jurisdiction, and not as a CWA citizens suit.

15. Should defendants present new grounds for dismissal of Count 1 of the amended complaint, plaintiffs may of course respond to those new grounds in timely fashion, according to local rules.