**NATURAL RESOURCES DEFENSE COUNCIL, et al., Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendant.**

**Civ. A. No. 3:91CV00058.**

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 30, 1992.

David Sanburg Bailey, Richmond, Va., for Natural Resources Defense Council, Inc., et al.

Robert William Jaspen, U.S. Attorney's Office, Richmond, Va., for U.S.E.P.A., Edwin B. Erickson and William Reilly.

Manning Gasch, Jr., Joseph Marvin Spivey, III, Hunton & Williams, Richmond, Va., for Westvaco Corp., Chesapeake Corp. and Union Camp Corp.

David Ellis Evans, McGuire, Woods, Battle & Boothe, Richmond, Va., for American Paper Institute, Inc.

J. Joseph Curran, Jr., Denise Ferguson–Southard, Neile Sue Friedman, Baltimore, Md., for State of Md., Dept. of Environment.

Thomas R. Long, Richard L. Schmalz, New York City, for Westvaco Corp.

Russell S. Frye, Chadbourne & Parke, Matthew Van Hook, Washington, D.C., for American Paper Institute, Inc.

J.P. Causey, Jr., Richmond, Va., for Chesapeake Corp.

Edward C. Minor, Franklin, Va., for Union Camp Corp.

Jon M. Lipshultz, Greer S. Goldman, U.S. Dept. of Justice, Environment and Natural Resources Div., Environmental Defense Section, Roland Dubois, Office of Gen. Counsel, U.S.E.P.A., Washington, D.C., Elizabeth Lukens, Office of Regional Counsel, U.S.E.P.A., Philadelphia, Pa., for defendants.

Robert W. Adler, Jessica C. Landman, Natural Resources Defense Council, Washington, D.C., for plaintiffs.

## MEMORANDUM OPINION

SPENCER, District Judge.

This case presents a challenge to the ambient water quality standards for 2,3,7,8–Tetrachlorodibenzo-p-dioxin (hereinafter "dioxin")[1] set by the states of Maryland and Virginia. Two actions are consolidated into the present case before this court: the Natural Resources Defense Council ("NRDC") sued over Environment Protection Agency ("EPA") standards set in Maryland and the Environmental Defense Fund ("EDF") sued over Virginia dioxin standards.

Several motions remain outstanding in this case. Presently before this Court is defendants' motions to dismiss and for partial summary judgment, and plaintiffs' mo-

tion for reconsideration. For the reasons stated below, this Court GRANTS defendants' motions for summary judgment as to all of the Virginia complaint, and Counts Two and Three of the Maryland Complaint. This Court GRANTS defendants' motion to DISMISS Amended Count One of the Maryland complaint. Finally, this Court DENIES plaintiffs' motion for reconsideration.[2]

## I.

◼ Plaintiffs challenge two closely-related actions taken under the Clean Water Act ("CWA"), 33 U.S.C. § 1251–1386, by the Administrator of the EPA ("Administrator") and other EPA officials. First, in amended Count One of the complaint regarding Maryland's dioxin water quality standards ("the Maryland Complaint") the plaintiffs challenge EPA's publication of water quality criteria guidance for dioxin pursuant to section 304(a) of the CWA, 33 U.S.C. § 1314(a). Plaintiffs raise this dispute based on what they term the EPA's failure to issue and revise, based on the latest available scientific data, dioxin standards that reach all identifiable health and environmental effects. Plaintiffs allege that such actions and inactions violate the CWA and EPA regulations under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.[3]

---

**1.** "Dioxin" refers to a class of closely related toxic organic chemical compounds, one of which is 2,3,7,8–Tetrachlorodibenzo-p-dioxin (2,3,7,8–TCDD). The discussion above refers only to 2,3,7,8–TCDD.

**2.** Discussions of the summary judgment motion by Intervenor American Paper Institute are incorporated into the above decisions. *See* n. 15, *infra.*

**3.** This Court permitted NRDC to amend its Maryland complaint to include alleged violations of the Administrative Procedure Act after dismissing Count One of the original complaint. On July 17, 1991, this Court granted EPA's motion to dismiss Count One of the Maryland Complaint because § 304(a) of the Maryland Complaint does not impose a mandatory duty to update its 1984 Dioxin Criteria Document, which divested this Court of jurisdiction over the matter.

Plaintiffs moved for reconsideration, or in the alternative, modification of this Court's July 17

order. Assuming that this is a Fed.R.Civ.P. 59(e) motion to alter or amend the judgment, this motion is untimely because it was served later than 10 days after entry of this court's decision.

Moreover, plaintiffs simply used this motion as an attempt to reargue their original gripe. The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99 (E.D.Va.1983).

In their motion to reconsider, plaintiffs first assert that section 303(c)(2)(B) allows States to

Second, the complaint regarding Virginia's dioxin water quality standard ("the Virginia Complaint") and Counts Two and three of the Maryland Complaint aver that EPA's approval of water quality standards by Maryland and Virginia violate the CWA. Plaintiffs contend that EPA, under the CWA, EPA regulations and the APA, improperly approved dioxin criteria too weak to protect against human cancer or to protect against other human health and environmental effects.

These two actions were consolidated by Court order dated April 10, 1991. In sum, then, plaintiffs seek the following:

(1) A declaratory judgment that EPA approval of the Maryland and Virginia standards was unlawful under the CWA, EPA regulations and the APA;

(2) A declaratory judgment that the EPA and the states failed to address all identifiable effects of dioxin on human health and welfare; and,

(3) An order from this Court disapproving the standards for dioxin set by Maryland and Virginia.

## II.

A motion for summary judgment may be granted "only if the pleadings, depositions, interrogatory answers, admissions, and affidavits show 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Magill v. Gulf & Western Indus., Inc.*, 736 F.2d 976, 979 (4th Cir.1984) (quoting from Fed.R.Civ.P. 56(c)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Houchens v. American Home Assurance Co*, 927 F.2d 163, 165 (4th Cir. 1991). "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."

adopt biological monitoring only until the EPA adopts numeric criteria. Plaintiffs next contend that water quality standards are translated into enforceable numeric effluent limitations. Finally, plaintiffs argue that cases support citizen suit jurisdiction where EPA has adopted a partial, but incomplete, rule.

*United States v. Lee*, 943 F.2d 366, 368 (4th Cir.1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

The moving party bears the initial burden of informing the district court of the absence of a genuine issue of material fact. The court must view the facts and the inferences drawn therefrom in the light most favorable to the party opposing the motion. *Ballinger v. North Carolina Agric. Extension Serv. Co.*, 815 F.2d 1001, 1004 (4th Cir.) *cert. denied* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

After the movant meets this burden the opposing party must "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed. R.Civ.P. 56(e)); *accord Allstate Financial Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir.1991). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in 56(c), except the mere pleadings themselves." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2553.

### III. Statutory and Regulatory Background

A brief presentation of the CWA and EPA regulatory background is in order. The broad objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by reducing, and eventually eliminating, the discharge of pollutants into these waters." 33 U.S.C. § 1251(a).

As established by the CWA, states and the EPA operate in partnership, albeit an unequal one. The states maintain primary responsibility for obtaining the goals of the act:

While plaintiffs alter slightly the angle of their approach, each of these issues was fully considered and disposed of by this Court in its July 17 Order. Plaintiffs should not get a second chance to take the same swing by putting a spin on the ball; this is not a "let" serve in tennis. Accordingly, the Motion to Reconsider is DENIED.

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

CWA section 101(b), 33 U.S.C. § 1251(b).

This Court recognizes the primary role states play in abating pollution in their jurisdictions. *See e.g., Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 489 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985); *District of Columbia v. Schramm,* 631 F.2d 854, 960 (D.C.Cir.1980) (Congress has "carefully constructed a legislative scheme that imposes[s] major responsibility for control of water pollution on the States."); *Committee for Consideration of Jones Falls Sewage Sys. v. Train,* 539 F.2d 1006, 1009 (4th Cir.1976).

*Water Quality Standards*

Water quality standards lie at the heart of the CWA regulatory scheme because enforcement provisions take effect through standards. Congress gave the states the leading role in this process by allowing them to set appropriate standards, while leaving the EPA with approval and rejection powers only.

The CWA prohibits discharges from point sources into the nation's waters except in compliance with the Act. Compliance is assured under the National Pollutant Discharge Elimination System ("NPDES"). Virginia and Maryland have authority to issue NPDES permits. CWA Section 402, 33 U.S.C. § 1342. These state agency decisions are subject to EPA review. *Id.* The NPDES permits cover two areas of concern: (1) technology-based effluent limitations which focus on the "best treatment technology" without reference to the effect on the water, and (2) (where necessary), more stringent water quality-based effluent limitations to ensure that receiving waters reach and maintain state water quality standards. CWA section 301(b); 33 U.S.C. § 1311(b).

Under § 303 of the CWA, states must adopt water quality standards for their own state and review them every three years. Section 303 also requires states to submit their adopted water quality standards to the EPA, which reviews them for compliance with the CWA. The EPA may approve the standards or notify the state of specific changes required to meet CWA requirements. If the state does not adopt such changes, or fails to submit any standards, the EPA must promulgate such standards as are necessary. *See* 33 U.S.C. §§ 1313(a), (b).

Each state "shall from time to time (but at least once each three-year period beginning with October 18, 1972)," hold hearings for the purpose of reviewing applicable water quality standards and "as appropriate, modifying and adopting standards." *Id.* § 1313(c)(1). When a state revises or adopts a new standard, that standard:

shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.

*Id.* § 1313(c)(2)(A).

In reviewing or revising standards, § 1313(c)(2)(B) directs that states:

shall adopt criteria for all toxic pollutants listed pursuant to section 1317(a)(1) of this title for which criteria have been published under section 1314(a) of this title, the discharge or presence of which in the affected waters could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses. Such criteria shall be specific numerical criteria for such toxic pollutants. Where

such numerical criteria are not available ... such State shall adopt criteria based on biological monitoring or assessment methods consistent with information published pursuant to section 1314(a)(8) of this title. Nothing in this section shall be construed to limit or delay the use of effluent limitations or other permit conditions based on or involving monitoring or assessment methods or previously adopted numerical criteria.

The states must submit their new or revised water quality standards to the EPA for review and approval or disapproval. CWA section 303(c)(2), 33 U.S.C. § 1313(c)(2).

The EPA reviews state submissions for six baseline requirements: (1) whether use designations are consistent with the CWA; (2) whether an adequate description of methods used and analyses conducted is provided; (3) whether water quality criteria sufficient to protect designated uses is included; (4) whether the antidegradation policy is sufficient; (5) whether the state Attorney General or other official certifies that the plan complies with state requirements; and, (6) whether satisfactory information regarding the adequacy of the scientific basis for standards other than the "fishable/swimmable" uses and on state policies affecting application and implementation of the standards is provided. 40 C.F.R. § 131.6. EPA regulations provide for state establishment of water quality criteria by (1) numerical values based on either: (i) EPA's criteria guidance developed under § 304(a) of the CWA; (ii) EPA's criteria guidance modified to reflect site-specific conditions, or (iii) other scientifically defensible methods; and (2) narrative criteria or criteria based on biomonitoring methods where numerical criteria is unavailable or as a corollary to numerical criteria. 40 C.F.R. § 131.11(b).

### IV. Factual Background

In 1984, EPA published an extensive background document on dioxin toxicity and its effects entitled *Ambient Water Quality Criteria for 2,3,7,8–Tetrachloro-dibenzo-p-dioxin* ("Dioxin Criteria Document") (EPA 440/5–84–007, February 1984). EPA has since published several assessments of risk regarding dioxin levels in certain locations or products, as well as more in-depth analyses. Also, EPA water criteria appear in summary form in a loose-leaf publication, commonly termed the "Gold Book," the most recent of which is *EPA, Quality Criteria for Water 1986* (May 1, 1986 (as revised)).

The 1984 Criteria Document, as well as supplemental data, serves as the basis upon which EPA operates regarding dioxin. Before and since the publication of the Criteria Document, scientists have engaged in considerable debate and controversy regarding the assessment of risk of dioxin exposure. Certain "default" presumptions, such as dioxin's tendency to cause cancer in humans because it does so in test animals and at what doses dioxin does so are hotly contested in the scientific community.[4]

Numeric water criteria to protect human health is based on an assessment of the dose of dioxin that may cause harm and the dose to humans that can be expected as a result of dioxin present in water. In weighing these factors EPA uses what it terms very conservative (*i.e.* highly protective) assumptions as to each element. This Court accepts the estimates used by EPA. This Court notes that EPA's cancer potency factor is the most conservative estimate used by any country in the world while remaining cognizant that both the Food and Drug Administration ("FDA") and the Center for Disease Control ("CDC") have adopted cancer potency factors smaller

---

**4.** EPA is currently undergoing a revision of dioxin criteria. Specifically, EPA will investigate what are called aromatic hydrocarbon ("Ah") receptors. Scientists suspect that these receptors (which are analogous to hormones or other cells in the human body), when binding with dioxin, cause the carcinogenic effects of dioxin exposure.

This comprehensive review, originally thought to take one year, will specifically address some issues challenged by plaintiffs such as cancer potency factors and fish consumption data.

than that used by the EPA. Six factors are at issue regarding the determination of dioxin criteria: (1) cancer potency;[5] (2) risk level;[6] (3) fish consumption; (4) bioconcentration factor ("BCF");[7] (5) water intake; and, (6) body weight. Plaintiffs primarily challenge Virginia and Maryland presumptions regarding the first four criteria.[8] The formula applied in the 1984 criteria document for determining risk is as follows:

$$\text{Risk} = \frac{\text{Potency Factor} \times (\text{chemical concentration} \times (\text{Water Intake} + (\text{Bioconcentration} \times \text{Fish Consumption})}{\text{Body weight}}$$

The formula used to establish numeric water quality standards is closely related:

$$\text{Dioxin Criteria} = \frac{\text{Risk Level} \times \text{Body Weight}}{\text{Potency Factor} \times (\text{Water Intake} + (\text{Bioconcentration} \times \text{Fish Consumption})}$$

Of the elements in the above equations, the cancer potency factor carries the most importance.

The gravamen of Plaintiffs' complaint is that the combination of several nonconservative assumptions creates too loose a criteria of 1.2 parts per quadrillion ("ppq") of dioxin for the standard in Maryland and Virginia. More specifically, plaintiffs allege that defendants simply approved the standard without explanation, especially without documenting why it rejected some of its own data and presumptions regarding dioxin.

However, EPA allows states a certain degree of flexibility in developing water quality criteria. A January 5, 1990 EPA Policy Memorandum highlights the degree of flexibility the EPA permits. *See State Policies, Water Quality Standards, and Permit Limitations Related to 2,3,7,8–TCDD in Surface Water* ("Policy Memorandum") (Jan. 5, 1990). While reserving the final decision on any case for the EPA, the Policy Memorandum nonetheless provides that:

> Any human health criterion for a carcinogen is based on at least three inter-related considerations; potency, exposure, and risk characterization. States may make their own judgments on each of these factors within reasonable scientific bounds, but documentation to support their judgments must be clear and in the public record.

> If a State relies on EPA's Section 304(a) criteria document (or other EPA documents), the State may reference and rely

---

**5.** A cancer potency factor is used to estimate the dose of dioxin that corresponds to a given plausible upper-bound risk of developing cancer over a lifetime of exposure to dioxin.

**6.** Risk level estimates the upper bound risk of developing cancer that is tolerable to a population.

**7.** The BCF predicts how many times greater the concentration of a pollutant will be in fish as compared to that amount found in the ambient water in which the fish lives.

**8.** This Court notes that the body weight assumption for both states was 70 kilograms (154 lbs.), which plaintiffs suggest excludes about half the population, women and children, from the standard applied. However, EPA assumes that smaller individuals will consume less fish and drink less water, and therefore will proportionally be protected. This Court finds such a presumption reasonable under the facts of this case.

on the data in these documents and need not created duplicative or new material for inclusion in their records. However, where site-specific issues arise or the State decides to adopt an approach to any one of these three factors which is different from that in EPA's criteria document, the State must provide an explanation of its reasons which is sufficient for a reviewer to determine that the approach chosen is based on sound scientific rationale.

Policy Mem. at 5.

Specifically, EPA informed States that it recognizes reasonable assumptions of potency factors other than its own conclusions. As such, the Policy Memorandum allows States to use EPA's own methodology, "another methodology or more than one methodology to estimate cancer potency for humans." Policy Mem. at 6. The Policy Memorandum suggests that States use EPA's BCF factor and pollutant-bearing water and fish ingestion unless it is known that exposure is likely to exceed EPA's estimates. *Id.* Finally, the Policy Memorandum indicates that, regarding the selection of a cancer risk level, "States have the primary authority to determine the appropriate level to protect human health or welfare." Policy Mem. at 4.

### V. EPA's Review of Maryland and Virginia's Criteria

#### A. Maryland

The Maryland Department of the Environment ("MDE") sent its proposed revisions to its water quality standards to EPA Region III on September 11, 1989. Maryland's criteria included a proposed criterion of 1.2 parts per quadrillion ("ppq") to protect human health. Maryland held three public hearings on its proposal: one in Baltimore on November 29, 1989, a second in Salisbury on December 7, 1989, and a third in Hagerstown on December 14, 1989. MDE received written comments on its water quality standards from the EPA, industry and environmental groups. Maryland adopted its proposed standards on March 21, 1990 and submitted them to EPA Region III on April 16, 1990 for review.

In its revisions, Maryland used the formula that the EPA used in its 1984 Dioxin Criteria Document. Maryland also used the EPA's assumptions regarding the consumption of pollutant-bearing fish, body weight and BCF factor. However, Maryland used the less conservative FDA potency factor rather than that of the EPA's Criteria Document.

By letter dated September 12, 1990, EPA formally approved Maryland's revisions to its water quality standards, including the proposed criterion for dioxin of 1.2 ppq to protect human health. This Court finds persuasive the explanation provided by the EPA in its Technical Support Document ("Maryland Support Document") accompanying its approval. EPA fully analyzed each assumption made by MDE in deriving its criterion, and the resulting criterion number afforded protection as to cancer and non-cancer risks to humans. Specifically, EPA concluded in its Maryland Support Document that MDE had employed scientifically defensible means in reaching its conclusions, and that 1.2 ppq was itself a scientifically defensible outcome in compliance with the CWA.

#### B. Virginia

On December 11, 1989, the Virginia State Water Control Board ("VSWCB") proposed a revision to its water quality standards. These changes included a criterion for dioxin of 1.2 ppq to protect human health. Like Maryland, Virginia held public hearings on the alterations. On February 12, 1990 comment was heard in Newport News, and on February 26, 1990, discussion was conducted in Lexington. As with Maryland, the VSCWB received written responses from State and federal agencies, environmental groups and industry.

On May 14, 1990 the VSWCB adopted the new criteria. On September 27, 1990, the VSCWB forwarded the proposed criteria, accompanied by appropriate summaries of explanation and certification from the State Attorney General, to EPA Region III.

Unlike Maryland, EPA requested further information from the Commonwealth of Virginia. In response, the VSWCB invited EPA to review the agen-

cy's administrative record. The EPA sent officials who studied the index to Virginia's 3000–page record, selecting parts for further examination. The Virginia Office of the Attorney General provided additional confirmation that the State's standard comported with State law. Moreover, the Circuit Court for the City of Richmond denied a challenge by the EDF, ruling that the VCSWB standard did not violate state law. *See Environmental Defense Fund v. State Water Control Board,* Chan. No. HA–731–3, Cir.Ct., City of Richmond (Aug. 7, 1991).[9]

The Virginia standards relied upon much the same assumptions as the Maryland criteria had. Virginia used the 1984 EPA criteria presumptions for consumption of pollutant-bearing fish, water ingestion rate, body weight and BCF. In parallel action to Maryland, Virginia used the FDA presumption for cancer potency factor. Since the EPA had approved such a process just the year prior, it is no revelation that it did so again.

■ Moreover, as in Maryland's case, EPA amply explained its approval by means of its Technical Support Document. EPA noted that it fully reviewed the Virginia procedure, finding that Virginia's criterion, including a finding of 1.2 ppq for dioxin was scientifically defensible, protective of human health, and in full compliance with the CWA.[10]

VI. Standard of Review

■ The arbitrary and capricious standard of review under section 10(2)(A) of the APA, 5 U.S.C. § 706(2)(A) (1976 and Supp. III 1979) is a highly deferential one. *Shanty Town Assoc. Ltd. Partnership v. EPA,* 843 F.2d 782 (4th Cir.1988). Such a standard presumes the Agency's action to be valid. *EDF v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981). Plaintiffs bear the burden of overcoming this presumption. *Mt. Airy Refining Co. v. Schlesinger,* 481 F.Supp. 257, 264 (D.D.C.1979) (citing *Udall v. Washington, Virginia & Maryland Coach Co.,* 398 F.2d 765 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969)). Such a standard forbids a Court from substituting its own judgment for that of an agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Maryland Wildlife Fed'n v. Dole,* 747 F.2d 229, 234 (4th Cir. 1984). The agency need only offer a rational basis for its action. *Bowman Transp. Inc. v. Arkansas–Best Freight Sys. Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974).

■ Additionally, in a case such as this, where the information at issue is highly scientific in nature, the basis of the agency action is entitled to even greater deference. *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). This Court has before it regulations that deal in areas bordering on the unknown, meaning that it should not interfere with expert evaluation of equivocal evidence. *New York v. EPA,* 852 F.2d 574, 580 (D.C.Cir.1988).

■ Moreover, this Court reviews an executive agency's construction of the statu-

**9.** EDF simultaneously petitioned EPA to disapprove Virginia's dioxin criterion.

Plaintiffs challenge this aspect of EPA's review process as insufficient. However, this Court can find no reason why this procedure does not satisfy the letter and the intent of the CWA. Additional information was requested and supplied. Clearly such information quelled any EPA hesitations, because the Agency approved the criterion by letter dated September 25, 1991. Moreover, a state court judge has ruled that the Virginia standard did not violate state law. This Court sees no reason to disturb EPA's determination that all requirements of 40 C.F.R. 131.6(e) were met, and therefore defers to the agency's decision that the Attorney Gener-

al's certification sufficiently met EPA regulations. *See Udall v. Tallman,* 380 U.S. 1, 16 (1965).

**10.** Plaintiffs challenge the approval of Virginia standards on another ground, alleging that the VSWCB improperly relied upon economic considerations when approving Virginia criteria. However, EPA carefully reviewed the contested proceedings, finding that "it is not clear from the record that any final determination was based on an inappropriate consideration of such [economic] matters." Virginia Technical Support Document at 4. This Court finds such a determination eminently reasonable, and refuses to disturb it.

tory scheme it is entrusted to administer. Agency decisions should not be disturbed or substituted by a judge who, unlike agency administrators, has no duty or expertise with regard to the statute. *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Shanty Town Assoc.,* 843 F.2d at 790. Therefore, this Court must carefully examine the full administrative record before the Agency at the time of its decision to evaluate whether or not the Agency's determination rested upon a rational basis. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 416, 91 S.Ct. at 823; *Camp v. Pitts,* 411 U.S. 138, 142–143, 93 S.Ct. 1241, 1243–1244, 36 L.Ed.2d 106 (1973).

## VII. Analysis

The role of this Court in this case can be distilled into answering three questions:

(1) Was EPA's review of Maryland and Virginia's standards consistent with the statutory mandate of the CWA?

(2) Did EPA consider all relevant factors?

(3) Is there a rational basis for EPA's decisions on the record?

Since this Court answers all three queries in the affirmative, it does not hesitate to grant summary judgment in favor of defendants as to all of the Virginia complaint, and Counts Two and Three of the Maryland Complaint.

## A. EPA Review

█ While plaintiffs attempt to characterize EPA's actions in reviewing the Maryland and Virginia Dioxin Criteria as allowing those states undue discretion, their arguments fail to recognize the statutory scheme established in the Clean Water Act. Under § 303 of the CWA, states clearly have the leading role in establishing water quality standards. *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985). The EPA reviews, via an independent analysis, states' criteria for consistency with the CWA. The CWA does not require uniformity among states, only compliance with its statutory mandate.

*See, e.g., Mississippi Comm'n on Natural Resources v. Costle,* 625 F.2d 1269, 1275 (5th Cir.1980); H.R.Rep. No. 189, 99th Cong., 1st Sess. 27, *reprinted in 2 Leg. Hist.* at 1098 ("None of these criteria lead [sic] themselves to a precise, uniform national definition. In reviewing State proposals to revise water quality standards pursuant to these criteria, EPA policy should be flexible enough to accommodate regional variations.").

The standard that the CWA requires is whether or not state standards are in a range of "scientific defensibility." Policy Memorandum at 5. EPA fully investigated any deviations from their 1984 criteria document, and both Maryland and Virginia passed scientifically defensible criteria. EPA had a full record before it at the time of its decision, and made a considered choice to approve the states' standards.

Plaintiffs are reduced to challenging minutiae of the record before the EPA. Plaintiffs note that Randall Waite, EPA's Regional Water Quality Standards Coordinator, criticized Maryland's use of a national average for fish consumption in a public hearing. Pltfs' Br. at 16. Plaintiffs also highlight a July 12, 1990 letter from Dr. Alvin R. Morris, EPA Region III's Water Management Director, challenging both the use of the FDA's lower cancer potency factor and Maryland's overall use on non-conservative assumptions. Pltfs' Brief at 18. Plaintiffs aver that elevated levels of dioxin have been found in water where effluent from the Westvaco pulp and paper mill runs, which is in Luke, Maryland. In Virginia, fishing advisories have been issued regarding the Jackson River receiving effluent from the Westvaco Mill.

It simply is not the function of this Court to second guess a complex administrative proceeding as plaintiffs would have it do. As already stated, this Court must afford the EPA great deference in a highly technical administrative decision such as this one. *Shanty Town Assoc. Ltd. Partnership v. EPA,* 843 F.2d 782, 790 (4th Cir.1988). Ample evidence exists to support EPA's decision-making process. It had a full record before it. Plaintiffs raise no issue the EPA

did not itself consider. This Court refuses to substitute its own judgment for that of administrative experts.

## B. Relevant Factors

Plaintiffs challenge the approval by EPA of several individual assumptions which, when taken together, allegedly create too great a risk of dioxin exposure. EPA, on the other hand, asserts that it considered all data before it, and found that the rationale behind Maryland and Virginia's presumptions was scientifically defensible. Accordingly, EPA approved the standards. Again, EPA's contentions persuade this Court.

EPA's recommended approach to deriving numeric water quality criterion to protect human health from chemical exposure in surface waters involves four considerations (the first three steps constitute "risk assessment" and the fourth step is termed "risk management"): (1) an identification of potential harmful effect resulting from exposure to the chemical, (2) an assessment of the degree or probability of harm associated with varying doses of the chemical, (3) and estimate of the dose to humans that is likely to result from varying concentrations of the chemical in surface waters, and (4) a decision regarding the degree of risk to human health that is tolerable.

Plaintiffs challenge EPA assumptions regarding several factors in determining a numeric criteria. Each is discussed below.

### (1) Cancer potency

█ Plaintiffs challenge the fact that both Virginia and Maryland relied upon an FDA estimation of cancer potency, which was lower than EPA's estimates. Plaintiffs highlight that Virginia and Maryland did not use any other FDA assumptions in calculating their water criteria levels.

The determination of a cancer potency factor for dioxin is a complicated process. Scientist have differed on their interpretations of data before them, especially a two-year rat feeding study conducted by Kociba, *et al.* All four federal agencies [11] dealing with dioxin have reached different determinations with regard to potency factors, in part because assumptions must be made in translating data from the rats to human exposure. Also, estimates of risk must be made regarding harm from the low doses considered safe for humans relative to the high doses administrated to the lab animals. In any event, the cancer risk estimates among the federal agencies differ mathematically by no more than a factor of nine.

EPA standards far exceed safety standards set by european countries and Canada, which were also based in part on the Kociba study. All federal agencies make a "non-threshold" assumption regarding dioxin, meaning that they assume that there is *no* safe level of exposure to dioxin. European countries and Canada have presumed the *is* some safe level of exposure to dioxin.

Most important to the case at bar, however, is that EPA has studied all agencies' potency presumptions, and has concluded that "there is no obvious scientific basis for excluding any of [the four estimates]" from the range of acceptable criteria. *See A Cancer Risk–Specific Dose Estimate for 2,3,7,8–TCDD*, Review Draft at 49 (1988) ("Dioxin Update"); Maryland Technical Support Document at 12; Virginia Technical Support Document at 12. Clearly, the FDA reached a scientifically defensible figure for cancer potency factor.[12] In fact,

---

**11.** These agencies are: The EPA, the Food and Drug Administration ("FDA"), the Center for Disease Control ("CDC"), and the Consumer Product Safety Commission ("CPSC").

**12.** The differences between the EPA and FDA presumptions are: (1) EPA considered all tumor types, while FDA weighed only tumors of the liver; (2) EPA excluded those animals that died during the first year of the test while FDA did not; (3) EPA took mean tumor count from two pathologists, while FDA considered the tumor count of only one pathologist; and, (4) EPA

translated the animal data into an assessment of human risk by assuming that humans and animals are equally sensitive in terms of dose per unit of surface area, whereas FDA assumes equal sensitivity in terms of dose per unit of weight.

This Court cannot term EPA's acceptance of the FDA cancer potency factor an abuse of discretion based on differences of approach so clearly within the purview of scientifically acceptable research methods.

some recent scientific evidence may suggest that EPA's current estimate may too high by a factor of 3 or 4. *See* Maryland Technical Support Document at 14; Virginia Technical Support Document at 14.

In approving Maryland and Virginia's use of the FDA figure, then, EPA acknowledged that no consensus exists in the scientific community as to a proper potency factor. EPA had ample scientific evidence to accept the FDA levels, and provided substantial information on the record as to why it could accept levels less conservative than that which the EPA adopted itself. EPA's approval was both reasonable and scientifically defensible. This Court cannot disturb an administrative judgment of this type.

### (2) Bioconcentration Factor (BCF)

■ The bioconcentration factor (BCF) accounts for dioxin's recognized ability to concentrate in the tissue of living organisms at levels far above those found in the ambient river water. Such concentration happens because dioxin is a "lipophilic" chemical. Lipophilic chemicals bind most easily with fatty tissues found in organisms, and avoid water or sediment.

Plaintiffs allege that Virginia ignored data (including EPA and VSWCB studies) indicating recommended BCF values from 25,000 to 150,000 (50,000 being that value supported by the weight of the evidence). Regarding Maryland, plaintiffs allege that Maryland "did not even perform a serious investigation of the BCF issue."

However, Maryland and Virginia adopted the EPA-recommended BCF of 5000. EPA approved the utilization of this figure based on extensive scientific records. Plaintiffs point to evidence that some within EPA, such as Dr. Phillip Cook, suggest that a higher BCF level may be appropriate. However, Dr. Cook used a "lipid" (fat content) level of fish 4.75 percent higher than the average in Maryland and Virginia fish. As such, a lower BCF factor would be not only scientifically defensible, but also more accurate.

Moreover, like potency factors, BCF factors are subject to constant debate and study. It is indisputable that a range of BCF levels are scientifically defensible and reasonable. Plaintiffs have offered nothing on the record which would persuade this Court that EPA arbitrarily and capriciously approved a BCF level of 5000. In its many studies, as well as its Technical Support Documents, EPA establishes to this Court's satisfaction the rationale behind its approval of the Virginia and Maryland criteria.

### (3) Fish Consumption

■ Both Virginia and Maryland used a national average for fish consumption. Plaintiffs assert the average of 6.5 grams per day is too low.

First, plaintiffs assert that fish consumption has increased since the 1977 Marine Fisheries Service study upon which the EPA estimate relies. Second, they contend that coastal states such as Virginia and Maryland have a far higher fish consumption than the national average. Third, plaintiffs aver that this standard does not protect important sub-groups of populations who consume high quantities of fish. Such groups include sportfishers and Native American tribes who have specific treaty rights to fishing. Plaintiffs assert that, when reviewing the states' standards, EPA admitted that "a factor of 30 g/day is more appropriate."

However, EPA had such information before it when approving the state submissions. Plaintiffs base their counter-proposal upon total fish consumed per day. EPA, however, considers only a subset of fish. The 6.5 gram per day is premised upon the subset of fish contain the *maximum* residues of dioxin permissible under State law. No evidence exists that this presumption is unreasonable.

Moreover, while more individuals may be eating fish, and while fish consumption may be higher in coastal states, such presumptions do not support a change in their estimate. The implementation of the Clean Water Act over the years may have concomitantly *reduced* fish consumed containing maximum residues of dioxin. Protection of subpopulations such as sportfishers and Native Americans will likely never be

effectuated by any broad based rule. However, both Maryland and Virginia provide for site-specific variations which these groups may use to implement stricter standards. *See* Md.Regs.Code tit. 26, § 26.08.-02.03–2(C); Va.Regs. 680–21–01.15.

The selection of an estimate of fish consumption is a matter of considerable technical judgment subject to a high level of deference by this court. While plaintiffs raise important scientific arguments, they appeal to the wrong forum by bringing such issues to this Court. EPA relied on scientifically defensible means to reach reasoned judgements regarding fish consumption levels.

### (4) Risk level

▮ Plaintiffs charge that both Virginia and Maryland improperly dropped the EPA risk level to 1 in 100,000 from the recommended 1 in 1,000,000. However, this Court cannot say that EPA did not reasonably combine all the information it had to determine that the state dioxin criteria protected against human cancer effects. The risk level approved by EPA has been found acceptable to state and federal risk managers, including EPA. Moreover, EPA's standard is among the strictest in the world.

Plaintiffs' averments would only force this Court to second guess an administrative decision soundly grounded in factual support and scientific research. Such a highly technical decision is entitled to deference from this Court.

### (5) Non-cancer effects

▮ Regarding non-cancer effects on humans, this Court also finds that EPA made valid assumptions. To measure this, EPA compared the states' criteria to ambient concentrations in surface water that EPA estimated would be unlikely to result in appreciable adverse effects to humans. Plaintiffs argue that the EPA should have used concentrated levels of dioxin in the "7Q10" flow (the lowest flow that occurs

for seven consecutive days once every ten years).

However, the EPA used the "harmonic mean flow" of the river (generally one-third or one-quarter greater than 7Q10) because levels of dioxin in ambient water take time to stabilize, and short term increases would have little long-term effect. EPA presents a full record upon which it concluded that short term swings in ambient water concentration are not likely to have a significant effect on dioxin concentration in fish. Maryland Technical Support Document at 22–28; Virginia Technical Support Document at 25–31.

Plaintiffs also challenge the EPA's use of a slightly higher level of "reference dose" in Virginia and Maryland state standards.[13] However, the EPA fully explained the scientific rationale behind its decision in its Technical Support Documents: the reference dose includes a "safety factor" of 1000 and assumes 100 percent absorption of ingested dioxin. Maryland Technical Support Document at 26; Virginia Technical Support Document at 26. As such, it incorporated a wide margin of error. Even if this Court were to disagree with such line-drawing, and it does not, the level of deference due to such decision-making precludes any substitution of its judgment by this Court. The EPA conclusively demonstrated that the deviation lies within scientific certainty, and is therefore scientifically defensible.

### (6) Wildlife and aquatic life protection

▮ Lastly, plaintiffs essentially argue that its was error for the EPA to review states' criteria only as it related to human health effects. Plaintiffs aver that the states were obligated to adopt a single numeric criterion for dioxin that protects against all identifiable effects to human health, aquatic life and wildlife.

However, EPA appropriately approved biological monitoring for protection of wildlife and aquatic life, and numeric criteria

---

**13.** EPA recommends a reference dose of 1 picogram/kilogram/day, which represents an estimate of the lifetime daily dose to humans that is likely to be without any appreciable risk of detrimental non-cancer effect due to long term

exposures. In order to prevent such exposure, EPA recommends ambient water concentrations not to exceed 2.15 ppq. Criteria Document at C–178 to C–179.

for human cancer causing elements. This Court has already fully explained its understanding that the Clean Water Act allows narrative criteria for some uses and numeric criteria for others. *See* Section 303(c)(2)(B), 33 U.S.C. § 1313(c)(2)(B); *NRDC, et al. v. USEPA, et al.*, No. 3:91CV00058, Memorandum Opinion and Order at 15 (E.D.Va., July 17, 1991).

### Conclusion

For the reasons stated above and reading the facts in the light most favorable to plaintiffs, this Court finds that EPA's review of Maryland and Virginia's standards was consistent with the statutory mandate of the CWA, that the EPA thoroughly considered all relevant factors and offered a rational basis for each of its decisions on the record. Accordingly, this Court GRANTS summary judgment in favor of defendants as to all of the Virginia complaint, and Counts Two and Three of the Maryland Complaint.

### VII. Motion to Dismiss Amended Count One of the Maryland Complaint

Finally, defendants filed a motion to dismiss Amended Count One of the Maryland complaint. Defendants argue that plaintiffs are barred by the applicable statute of limitations, and that they have failed to exhaust administrative remedies.

### A. Statute of Limitations

No applicable statute of limitations can be found in the Administrative Procedure Act ("APA") or in the CWA. Paragraph 45 of the Amended Complaint is the only claim challenged under a six year statute of limitations for suits against the federal government. 28 U.S.C. § 2401(a). Paragraph 45 alleges: "(1) EPA's failure to address effects other than human cancer when it promulgated its 1984 criteria document for dioxin violated the Administrative Procedure Act ("APA") because it was arbitrary and capricious and not otherwise in accordance with the law; and (2) EPA's ongoing failure to issue water quality for dioxin that properly address such effects constitutes agency action unlawfully withheld."

This Court finds that the plaintiffs only knew of all essential facts of their claim when the EPA approved the Virginia and Maryland standards in 1990, not when the EPA issued its Criteria document in 1984. Applying a discovery rule as is appropriate in this case, this Court finds that plaintiffs are not barred by the statute of limitations.[14]

Defendants argue that the February 15 publication of the criteria document in the federal register constitutes notice. Citing *Shiny Rock Mining Corporation v. United States*, defendants assert that plaintiffs were sufficiently notified as to the EPA's action. 906 F.2d 1362, 1364 (9th Cir.1990). However, in *Shiny Rock*, the Federal Register notice was a Public Land Order which was a final order of land withdrawal. Here, by defendants' own admission, the February 15 criteria document "stated unequivocally that [these criteria] are not intended to be rules, not to have any regulatory impact." This Court cannot impose any "notice" on plaintiffs based on such a document.[15]

Finally, the Fourth Circuit has applied a discovery rule regarding the two year statute of limitations in tort cases, and an extension of that rule to the instant action is not unwarranted. *See Portis v. United States*, 483 F.2d 670 (4th Cir.1973). The fundamental issue in this case is that the

14. A "discovery rule" provides that the statute of limitations does not begin to run until plaintiffs discover, or reasonably should have discovered, all the elements of their claim.

15. Intervenor American Paper Institute ("API") moves for summary judgment based on the argument that plaintiffs' paragraph 45 of the amended complaint (failure to issue complete water criteria) is barred by the statute of limitations. Its party brief adds nothing to the argument made by defendants discussed above.

Second, API moves for summary judgment on Paragraph 46 of the complaint (failure to revise based on latest scientific knowledge). API argues that this court has already determined that the Administrator lacks a mandatory duty to revise the standards. Second, API avers that NRDC has failed to exhaust administrative duties because it has not petitioned EPA for change pursuant to § 553(e) of the APA, nor has it informed EPA of its intention to sue. This argument parallels that made by defendants above under *Oljato* and will be analyzed there.

February 15 order was nonbinding on EPA. As such, challenges to it could not begin until an interpretation of it was instituted.

### B. EPA's Comprehensive Review of Dioxin

 Defendants assert that EPA's comprehensive review of the water quality criteria for dioxin means that EPA has not taken a reviewable final agency action. As such, defendants argue for dismissal of Count One. This reevaluation began after the Administrator ordered such a review on April 8, 1991. EPA reached this decision after information came to its attention suggesting that the level of dioxin might be *increased* safely, relative to existing standards. As noted above, while originally scheduled to take one year, this comprehensive review focussing on Ah Receptors may take up to five years.

This Court has repeatedly commented in this Opinion that decisions such as that the plaintiffs wish to make lie firmly within the purview of administrative parties. The fact that the EPA is currently conducting a comprehensive review of dioxin standards only persuades this Court further. The jurisdiction to hear and review plaintiffs' challenges lies with the EPA, not this District Court.

Plaintiffs must first petition for a revision of the 1984 criteria guidance before it may bring this action in federal court. This procedure is warranted because the establishment of dioxin criteria requires informed decisionmaking based on administrative, not judicial, expertise. *See Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654 (D.C.Cir.1975).

While this Court expresses its desire for all parties to work together to expedite this review process, it will not order a strict schedule by which EPA must respond to plaintiffs' petition. EPA may lack standing to request that the court order such an expedited review under *Consolidation Coal Co. v. Costle*, 483 F.Supp. 1003, 1011–13 (S.D.Ohio 1979). While this Court admonishes all parties not to prolong scientific study unreasonably, this Court concomitantly recognizes that the complexity of the information at hand requires detailed review.

Until any final determination proceeds from the EPA administrative review process, this Court cannot review the matter. Accordingly, amended count one of the Maryland complaint is DISMISSED.

And it is SO ORDERED.